UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
|        Plaintiff, : | |
| : | |
| v. : | File No. 1:12-cr-85-jgm-01 |
| : | |
| ROYAN WINT, a/k/a "G-Roy," : | |
|        Defendant. : | |
| _____ : | |

RULING ON MOTION TO SUPPRESS
(Doc. 32)

I.     Introduction

        Defendant Royan Wint is charged with conspiracy and possession with intent to distribute narcotics in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846. (Doc. 26.) Wint moves to suppress all evidence and statements obtained as a result of a search of his residence and car in Bennington, Vermont, arguing his Fourth Amendment rights were violated. (Doc. 32.) The government opposes the motion. (Doc. 35.) The Court held an evidentiary hearing on January 13 and January 29, 2014, and heard testimony from Vermont State Police Detective Casey Daniell, Trooper Wayne Godfrey, Trooper Robert Zink, and Wint. Both Wint and the government filed supplemental briefing. (Docs. 77, 78, 79.) For the reasons below, the Court denies Wint's motion.

II.     Background

        A.     Witness Credibility

        At the evidentiary hearing, Vermont State Police Detective Daniell and Wint both testified about Wint's interrogation on May 22, 2012. They provided markedly contrasting accounts of the interrogation. Wint and Trooper Robert Zink also provided conflicting testimony about the circumstances in which Wint granted written consent to search his car. For the reasons explained more fully below, the Court finds Detective Daniell and Trooper Zink more credible and adopts

their accounts. Notwithstanding its doubts about Wint's credibility, the Court has incorporated portions of his testimony into its findings.

    B.    <u>Factual Findings</u>

The following facts are taken from the evidence presented at the January 13 and January 29 hearings and other documents submitted as evidence by the parties.

    1.  <u>The Traffic Stop</u>

At approximately 11:47 p.m. on May 21, 2012, Trooper Godfrey performed a traffic stop on a green Chevrolet Cavalier for failing to use a turn signal. Dft. Ex. A at 3 (Godfrey affidavit). When the driver, Mason B. Ingraham, opened the center console to get his identification, Godfrey saw a glass pipe inside which he recognized as something used to smoke marijuana. <u>Id.</u> Godfrey asked both Ingraham and the passenger, Shauna T. Poole, to exit the car. <u>Id.</u> After patting them both down for weapons, Godfrey asked Poole if he could search her purse. <u>Id.</u> Poole consented and inside the purse, Godfrey found "a plastic tube that had white powdery residue inside." <u>Id.</u> Godfrey then searched the car. <u>Id.</u> at 4. During the search, Godfrey found another glass pipe, an electronic scale, and two plastic bags "containing a white powdery substance which [he] recognized as cocaine." <u>Id.</u> The substances later tested positive for cocaine. <u>Id.</u> at 5.

Ingraham first told Godfrey that he and Poole had been at a friend's house on Grove Street watching a basketball game, but later said they did not actually watch the game. Dft. Ex. A at 4. Godfrey then questioned Poole, who first said they had gone to the house to watch basketball, but then admitted they really went to buy cocaine. <u>Id.</u> Poole told Godfrey there were two black males (named Roy and Lem) and a female at the residence. <u>Id.</u> Poole also told Godfrey she would cooperate and give a written account of the drug transaction, which she said took place between Ingraham and one of the men inside a bedroom at the residence. <u>Id.</u>

Town of Bennington Police Officer Nicholas Holden then drove Poole to Grove Street, where she voluntarily pointed out the residence as 306 Grove Street. Dft. Ex. A at 4. Poole also told Godfrey she could show him the Facebook profile of one of the males. Id. She pulled up his profile, and Godfrey "observed [a photo of] a black male who was identified as Royan A. Wint." Id. Godfrey then entered Wint's name into the Vermont State Police's Spillman database, which produced a picture consistent with the Facebook profile picture. Id. The database revealed Wint's vehicle had been stopped and searched twice in February 2012. Id. In the first stop, an officer found a plastic baggy with a white powdery substance, but it was not enough to test and "no further actions were taken." Id. In the second stop, police found a small amount of marijuana, torn plastic bags, and Q-tips. Id. at 4-5. According to Godfrey, "[t]he cotton from the [Q]-tips is commonly used in the drug world as a filter to draw a liquid narcotic through to inject it intravenously." Id. at 5.

Godfrey also spoke to Ingraham, who similarly agreed to cooperate and provide a written statement. Dft. Ex. A at 4. According to Godfrey, Ingraham's statement included that he had gone to the residence three times in the past month to buy cocaine. Id. Ingraham told Godfrey that on that night, he bought $200 of cocaine from a black male in the bedroom. Id. According to Ingraham, the male kept his drugs in the bedroom or in his shoes and might possess as much as five ounces of cocaine and other drugs. Id.

    2.  <u>The Search of 306 Grove Street</u>

Based on the above information, Trooper Godfrey quickly applied for a warrant to search the residence addressed as 306 Grove Street for narcotics and related evidence. Dft. Ex. A at 2-5. The sworn statements of Ingraham and Poole were not attached to Godfrey's affidavit. Judge David Howard issued the warrant at approximately 5:36 a.m on May 22, 2012 -- less than six hours

after the initial traffic stop.  Id. at 1.  Godfrey and other officers executed the search warrant approximately two hours later and found substantial amounts of cocaine powder, crack cocaine, "various narcotic pills," and at least $11,000 in cash.  (Doc. 32 at 3 (Wint's Motion to Suppress)).  The police took all three occupants of the residence -- Felicia Young, Royan Wint, and Duran Forrester -- into custody.  Id.

### 3. The Interrogations

At approximately 11 a.m. on May 22, 2012, Detective Daniell interviewed Young.  She told Daniell that she and Wint distributed pills together and she had seen Wint acquire cocaine.  Young also said she and Wint had actually driven by Trooper Godfrey's traffic stop of Ingraham and Poole.  After they witnessed the traffic stop, Young said Wint drove his car, a 2007 Dodge Nitro, to a hospital parking lot in order to hide it from the police, whom he feared were investigating him.  Young also said Wint used the car to transport narcotics from New York City to Bennington, Vermont.  Based on this information, the police found Wint's car at the hospital parking lot, seized it, and brought it back to the Shaftsbury, Vermont barracks.

Detective Daniell met with Wint in an interview room at the Bennington Police Department at approximately 2:30 p.m. on May 22, 2012.  Daniell did not offer Wint food or a blanket.  By this point, Wint had been in custody for several hours and had not eaten anything since the night before.  Daniell read Wint his Miranda rights and Wint signed a written waiver.  Gov't Ex. 1.  Wint initially denied any involvement in illegal narcotics distribution, but then admitted the seized drugs at 306 Grove Street were his.  Wint also detailed his previous drug activity, admitting that he acquired cocaine and pills in New York City and Albany, New York, and gave Young pills to distribute in New Hampshire.  Daniell testified the interview lasted under an hour.

4.      The Search of the Dodge Nitro

In the afternoon on May 23, 2012, Trooper Zink went to the Vermont Superior Court in Bennington to find Wint and ask permission to search his car. Just before Zink spoke to Wint, a court clerk and Lieutenant Brookman of the Bennington Sheriff's Department each told Zink that Wint had not yet been assigned counsel. At approximately 2:30 p.m., Zink explained to Wint that he had probable cause to search the car and gave him the choice of providing consent to search or declining consent and letting Zink attempt to get a search warrant. Because Marissa Chen was a co-owner of the car, Wint also wanted her to give consent. Zink then received written consent from Wint to search the vehicle. After calling Chen and meeting her at the Shaftsbury police barracks, Zink received written consent from Chen as well.

III.    Discussion

The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has long declared a preference for searches pursuant to a warrant. United States v. Leon, 468 U.S. 897, 913-14 (1984). "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "A judge's probable-cause determination is not overly strict." United States v. Martin, 426 F.3d 68, 74 (2d Cir. 2005). When "[p]resented with a warrant application, the judge must 'simply . . . make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, [. . .] there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" Id. (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983) (emphases removed)).

5

"[A] court reviewing a challenged warrant -- whether at the district or appellate level -- 'must accord considerable deference to the probable cause determination of the issuing magistrate.'" United States v. Clark, 638 F.3d 89, 93 (2d Cir. 2011) (quoting Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007)). The fact that a judge found probable cause "is itself a substantial factor tending to uphold the validity of the warrant" and "in a close case any doubts should be resolved in favor of upholding" it. United States v. Jackstadt, 617 F.2d 12, 13-14 (2d Cir. 1980); see Leon, 468 U.S. at 914. "[T]he task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination." Clark, 638 F.3d at 93 (quoting Gates, 462 U.S. at 238).

    A.    Validity of the Warrant

Wint argues there are material deficiencies in the warrant and Godfrey's affidavit. "[M]inor clerical errors generally are not fatal to a search warrant." United States v. Waker, 534 F.3d 168, 172 (2d Cir. 2008). First, there is a blank space in the warrant where Judge Howard did not fill in the execution deadline. Dft. Ex. A at 1. The Fourth Amendment, however, "does not specify that search warrants contain expiration dates." United States v. Ahmad, No. 11-cr-6130L, 2012 WL 1944615, at *8 (W.D.N.Y. May 29, 2012) (internal quotation marks and citation omitted), report and recommendation adopted, 11-cr-6130L, 2012 WL 3028302 (W.D.N.Y. July 24, 2012). Although it should have been filled in, this oversight does not render the warrant invalid. See, e.g., United States v. Hugoboom, 112 F.3d 1081, 1087 (10th Cir. 1997) (rejecting argument that magistrate's failure to fill in warrant's expiration date was constitutional error). Wint also claims the warrant fails to describe the location to be searched. (Doc. 32 at 2.) This argument is meritless; the warrant sufficiently identifies 306 Grove Street. See Dft. Ex. A at 1.

Second, Godfrey's application, affidavit, and the warrant itself suffer from inconsistent dates. The application is dated May 22, 2012. Dft. Ex. A at 2. Godfrey dated the affidavit May 21, 2012, but Judge Howard dated the affidavit May 22, 2012. Id. at 5. Godfrey testified that he began preparing the warrant on May 21 and Judge Howard signed it -- about six hours later -- on May 22. One version of the warrant signed by Judge Howard is dated May 21, 2012, at 5:36 a.m. Id. at 1. Godfrey testified this version is the warrant he presented to Judge Howard. Another version is apparently initialed by the judge at 5:26 a.m. Id. at 6. This second version leaves blank the space provided to write in the town and county where the warrant was signed, which the other version includes. Godfrey testified that he had not previously seen the second version of the warrant, and he did not bring that copy to Judge Howard. The Court credits his uncontradicted testimony. Both copies were filed in Vermont Superior Court.

In any event, these are scrivener's errors, not material deficiencies. "[W]hen information within a search warrant permits the establishment of intended -- but imperfectly scribed -- dates, the document is not rendered deficient." Waker, 534 F.3d at 171; see id. at 172 ("We find that the only logical conclusion to be drawn from all of the evidence in the record is that both of the incorrect dates were merely scrivener's errors or products of clerical inadvertence. The defendant points to no evidence to the contrary." (citing cases)). The events described in Godfrey's affidavit began at approximately 11:47 p.m. on May 21, 2012. Dft. Ex. A at 3. Judge Howard issued the warrant less than six hours later, on May 22, 2012, and police executed it shortly thereafter. A one-day mistake in dates here is not a material error, and the Court rejects Wint's argument that Judge Howard's review of the affidavit was "confused." (Doc. 32 at 8.)

Third, Godfrey's affidavit states the sworn statements of Ingraham and Poole "are attached and incorporated for further reference," but they were not actually included with the warrant or

application.  Dft. Ex. A at 4-5.  At the hearing, the government stipulated the statements were not attached.  Wint claims Godfrey's oversight -- and Judge Howard's failure to request copies of these statements -- renders the warrant invalid.  (Doc. 77 at 2-3.)

Even without the statements, Judge Howard had a "substantial basis" for finding probable cause based on Godfrey's affidavit alone.  Gates, 462 U.S. at 239.  After performing the traffic stop, Godfrey discovered cocaine inside Poole's purse and Ingraham's vehicle.  Both eventually told him they had just bought cocaine at 306 Grove Street.  And although Godfrey failed to attach their sworn statements, his affidavit describes, in detail, what both Ingraham and Poole told him.[1]  Dft. Ex. A at 4.  Poole also "voluntarily rode with [Officer] Holden to Grove Street and pointed out the residence" where Ingraham had purchased the cocaine, and "Poole advised it was 306 Grove Street."  Id.

---

[1] In part, Trooper Godfrey's affidavit states:

> I asked Poole why they really went to the residence.  Poole stated to buy the cocaine.  Poole stated when they went to the residence there was two black males, one identified as Roy and the other as Lem and a female who is unnamed.  Poole stated she waited at the table in the kitchen and Ingraham and one of the males left to go into a nearby bedroom to do the drugs transaction.  Poole stated she would cooperate and provide a written statement about Ingraham and her going to the residence to purchase narcotics . . . .
>
> Ingraham[']s [statement] included that he has gone to the residence three times this past month to purchase cocaine from a black male that resides at the residence.  Ingraham stated tonight when he went to the residence he purchased $200.00 of cocaine.  I asked Ingraham if he knew the name of the male, but he said he did not.  Ingraham advised the transaction took place in a bedroom.  Ingraham also disclosed it is in the bedroom where the male keeps his stash.  It was described that sometimes the male keeps the narcotics in his shoes, but not always.  During a conversation that Sgt. John Paul Schmidt had with Ingraham, Ingraham indicated that the male could have upwards of five ounces of powder cocaine and other assorted narcotics.

Dft. Ex. A at 4.

This is far from a "bare bones" affidavit providing only conclusory statements.  Gates, 462 US. at 239.  If Godfrey's affidavit had merely stated, "for the reasons articulated in the attached statements of Ingraham and Poole, I have probable cause to believe narcotics will be found at 306 Grove Street" -- and had failed to attach the statements -- it would be a different story.  Here, however, Godfrey sufficiently described in his affidavit what Ingraham and Poole told him, and what Godfrey himself and other officers discovered and observed.  This is enough.  "[G]iven all the circumstances set forth" in Godfrey's affidavit, Judge Howard properly had a substantial basis to conclude probable cause existed.  Gates, 462 U.S. at 238.

    B.        Request to See the Warrant

Wint also argues he did not receive a copy of the warrant.  Under Rule 41(f)(1)(C) of the Federal Rules of Criminal Procedure, "[t]he officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property."  Trooper Godfrey testified a copy of the warrant was left at 306 Grove Street but he does not remember personally giving Wint a copy.  He also testified Wint did not ask to see a warrant and he never refused to give him one.  Wint, however, testified he asked Godfrey and another officer for a copy at the time of the search, but they refused.

In dicta, the Supreme Court has noted "that neither the Fourth Amendment nor Rule 41 of the Federal Rules of Criminal Procedure requires the executing officer to serve the warrant on the owner before commencing the search."  Groh v. Ramirez, 540 U.S. 551, 562 n.5 (2004); but see United States v. Williamson, 439 F.3d 1125, 1132 (9th Cir. 2006) (under Ninth Circuit jurisprudence, agents must "provide a copy of the warrant at the outset of the search.").  The Second Circuit has held that unless a "defect made what was done in effect an unconstitutional warrantless search,

violations of Rule 41 alone should not lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." United States v. Burke, 517 F.2d 377, 386-87 (2d Cir. 1975).  Neither circumstance is present here.  Even if the Court credits Wint's testimony that the police did not give him a copy of the warrant, nothing contradicts Trooper Godfrey's testimony that he left a copy at the residence.  Wint was arrested at the scene; presumably, he might not know if a warrant had been left.  And even had the officers failed to leave one, the Court finds such a violation would not be of "constitutional magnitude" requiring application of the exclusionary rule -- Wint offers no evidence he suffered prejudice or that the police deliberately disregarded the delivery requirement contained in Rule 41. Burke, 517 F.2d at 386; see United States v. Jacobson, No. 12-cr-432-jfb, 2014 WL 962227, at *11 (E.D.N.Y. Mar. 13, 2014) (collecting cases).

      C.     Miranda Waiver

Next, Wint argues he did not voluntarily waive his Miranda rights and Detective Daniell coerced him into confessing.  (Doc 32 at 9; Doc. 77 at 5.)  The government argues Wint validly waived his rights and his testimony at the suppression hearing is not credible.  An individual must be advised of Fifth Amendment rights before custodial interrogation.  Miranda v. Arizona, 384 U.S. 436, 444 (1966).  An individual has the right not to speak and to request an attorney while in custody and any interrogation must stop until an attorney is present.  Id. at 474.  The government bears the burden of establishing by a preponderance of the evidence that law enforcement officers properly advised an accused of his Fifth Amendment rights and that he made a knowing and voluntary waiver of those rights.  Id. at 444; Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Ramirez, 79 F.3d 298, 304 (2d Cir. 1996).

In determining voluntariness, courts must consider the totality of the circumstances. In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 177, 213 (2d Cir. 2008). "Specifically, these circumstances include 1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police." Id. (quoting Parsad v. Greiner, 337 F.3d 175, 183 (2d Cir. 2003)). No single factor is dispositive, however. Green v. Scully, 850 F.2d 894, 901 (2d Cir. 1988). When testimony conflicts, "[i]t is within the province of the district court as the trier of fact to decide whose testimony should be credited . . . . And as trier of fact, the judge is entitled, just as a jury would be . . . to believe some parts and disbelieve other parts of the testimony of any given witness." United States v. Fijal, 12-CR-14-A, 2013 WL 5522887, at *9 (W.D.N.Y. Oct. 3, 2013) (internal quotation marks and citation omitted). "An adverse credibility determination is 'appropriately based upon inconsistent statements, contradictory evidence, and inherently improbable testimony.'" Id. (quoting Diallo v. INS, 232 F.3d 279, 287-88 (2d Cir. 2000)).

Wint is a 26-year-old high school graduate with no previous convictions. (Doc. 59 at 2.) His counsel argues Wint had "no prior experience with law enforcement." (Doc. 32 at 4.) The Court takes this to mean Wint had not previously been arrested or subjected to extended police interrogation because, as noted in Trooper Godfrey's warrant affidavit, Wint had been pulled over twice in February 2012, and the police searched his vehicle both times. Dft. Ex. A at 4. There is no evidence suggesting Wint had "below-average intelligence or mental vulnerabilities." Fijal, 2013 WL 5522887, at *11. In the Court's view, Wint appeared articulate on the witness stand. There is no evidence Wint could not understand and appreciate the effects of his actions.

Wint moved from Jamaica to Vermont 12 years ago and attended high school in Bennington. (Doc. 59 at 2.) At the hearing, Wint testified he "absolutely" watched television but claimed never to have heard of Miranda warnings before his interview. The Court is dubious.

11

See Dickerson v. United States, 530 U.S. 428, 443 (2000) ("Miranda has become embedded in routine police practice to the point where the warnings have become part of our national culture."). On cross-examination, Wint conceded that at the beginning of the interview, he understood he did not have to confess -- indeed, Wint testified he initially denied any involvement in distributing drugs.

Daniell testified he read Wint his Miranda rights, line by line, at the beginning of the interview. See Gov't Ex. 1. According to Daniell, Wint understood these rights, did not have any questions, and at no time expressed reservations about speaking with him. Daniell stated he told Wint that he would not have to answer any questions if he did not want to, and testified that Wint signed and dated the waiver on May 22, 2012, at 2:30 p.m. See id. This coincides with the date and time Daniell filled in at the top of the waiver -- May, 22, 2012 at 14:28 -- and when Daniell testified the interview began. At the time of the interrogation, Wint had been in custody for approximately seven or eight hours. According to Daniell, the interview lasted "not even an hour." These are not exceptionally long periods of time. See United States v. Juvenile Male, 12-cr-594-jfb, 2013 WL 4830947, at *15 n.10 (E.D.N.Y. Sept. 11, 2013) (collecting cases). In any event, there is no evidence Wint asked for a break during the interview and was refused.

The interrogation occurred in an interview room in the basement of the Bennington Police Department. Daniell testified he did not notice anything unusual about the temperature and Wint did not ask for food or otherwise comment about his well-being. Through counsel, Wint argues he requested a blanket at some point in his detention but did not receive one. (Doc. 32 at 4.) Wint testified he had been wearing a t-shirt and shorts, he was cold, and he had not eaten since seven p.m. the night before. He claims nobody offered him a blanket, food, water, or access to a bathroom. Although "physical punishment such as the deprivation of food or sleep" is a factor to be considered in determining the voluntariness of a waiver, see Schneckloth v. Bustamonte, 412 U.S.

218, 226 (1973), Wint did not testify that he actually asked for food or water -- his counsel simply argues none was provided.  (Doc. 77 at 6.)  Daniell did state he did not offer food or a blanket.

Daniell testified that after Wint signed the Miranda waiver, he confronted Wint with what Felicia Young had previously told the police.  As noted above, Young told Daniell that she and Wint distributed pills together, she had previously seen Wint acquire cocaine, and that the two had actually driven past the traffic stop of Ingraham and Poole -- which prompted Wint to hide his vehicle in the hospital parking lot.  Wint similarly testified that Daniell said Young had "thrown him under the bus."  Although Wint initially denied any involvement in the distribution of drugs, he eventually incriminated himself.

Daniell and Wint have markedly different accounts of Daniell's conduct during the interview.  Daniell testified he was polite, professional, and nice.  Wint, on the other hand, testified that:  (1) Daniell was so angry and agitated during the interview that his spit landed on Wint; (2) Daniell called Wint a "low-life," a "drug dealer," and a "nigger" who would be raped in prison; (3) Daniell repeatedly threatened that Wint would "do 15 years upstate" unless he cooperated by corroborating Young's statements; (4) Daniell said there was nothing a lawyer could do for him and he could not afford one anyway; and (5) Wint specifically asked to speak to an attorney three times during the interview and Daniell denied him all three times.  Wint also testified he signed the Miranda waiver after his confession, not at the beginning of the interview, and Daniell and another officer "pretty much coached" him into doing so.  Daniell denied every one of these claims and testified Wint never asked for an attorney.

Wint's allegations are no doubt serious, but the Court finds his testimony "inherently improbable."  Fijal, 2013 WL 5522887, at *9 (internal quotation marks and citation omitted).  As a criminal defendant, Wint has a strong interest in providing self-serving testimony.  See United States

v. Gaines, 457 F.3d 238, 244 (2d Cir. 2006) ("[A] testifying defendant in a criminal trial has a personal interest in its outcome that is as deep as it is obvious."). On cross-examination, he testified he understood that a conviction could mean a mandatory five-year sentence and deportation. Wint also testified he knew that what he said at the suppression hearing could impact the rest of his case.

Although "arresting officers have an indisputable interest in the outcome of cases they testify in," Gaines, 457 F.3d at 249 n.7, the Court finds it wholly unlikely Daniell violated Wint's Miranda rights, repeatedly, in such a flagrant manner -- and then lied about it under oath -- when the evidence against Wint was already substantial. At the time of the interview, the police had recovered a large amount of cocaine and other drugs from Wint's house -- not to mention Young's statements incriminating Wint as a co-conspirator.

In sum, the Court does not credit Wint's testimony. Much of it appeared overly calculated and inherently improbable.[2] Daniell's testimony, on the other hand, was forthright, confident, and probable. The Court finds credible Daniell's testimony that he did not threaten Wint or otherwise impermissibly attempt to coerce his cooperation. Daniell did testify he informed Wint of the benefits of cooperating with the police and what cooperation might entail. "It is well-established in this circuit that [g]enerally, promises of leniency will not render a confession involuntary . . . and are just one factor to be weighed in the overall calculus in assessing the totality of the circumstances." United States v. Riedman, 11-cr-6083-cjs, 2014 WL 713552, at *29 (W.D.N.Y. Feb. 18, 2014) (internal quotation marks and citation omitted) (alteration original). Daniell stated he did not tell Wint the only way to help himself was to corroborate Young's statements, and testified he could not make such promises. The Court credits this testimony. Simply put, there is no credible evidence

---

[2] This includes Wint's testimony that he also repeatedly asked for a lawyer while being taken into custody at his apartment, but was similarly ignored.

before the Court that Wint was coerced into confessing. Under the totality of the circumstances, the government has satisfied its burden of demonstrating Wint knowingly and voluntarily waived his Miranda rights.

      C.      The Search of the Dodge Nitro

Finally, Wint moves to suppress "any and all evidence" found in his car.[3] (Doc. 32 at 1; Doc. 77 at 1.) Wint and a co-owner of the vehicle, Marissa Chen, consented to a search in writing.[4] Gov't Ex. 2. Wint argues he already had an attorney at this point and claims Zink threatened to smash the car windows if he did not give consent. The government argues Wint validly consented to the search, he did not yet have an attorney, and, in any event, the police had probable cause to search the vehicle -- rendering the consent issue moot.

Trooper Zink testified that after Felicia Young told the police that Wint had hidden his car at the hospital parking lot, the police seized it and brought it to the Shaftsbury barracks. Although he believed he had probable cause to search the car, Trooper Zink requested Wint's permission to search it because "[u]nder the Vermont Constitution, unlike the federal constitution, protection against warrantless searches extends to automobiles." State v. Birchard, 5 A.3d 879, 884 (Vt. 2010). Accordingly, Zink would have needed either consent or a warrant to search Wint's car. In a federal prosecution, however, federal law applies. See United States v. Pforzheimer, 826 F.2d 200, 203-04 (2d Cir. 1987) ("[F]ederal law should apply to this federal criminal prosecution, even though the underlying investigation leading to prosecution was conducted solely by state officials.").

---

[3] Neither party mentions what evidence the police actually discovered in the car.

[4] It is unclear whether Chen signed the same consent card as Wint, see Gov't Ex. 2, or another card not in evidence. In any event, Wint does not dispute Chen consented to the search. He argues the results of the search should be suppressed because Zink "compelled, coerced and/or improperly convinced Mr. Wint to call Marissa Chen . . . and ask her to provide written consent." (Doc. 77 at 10.)

"Under the 'automobile exception' to the Fourth Amendment warrant requirement, police may conduct a warrantless search of a readily mobile vehicle if probable cause exists to believe [it] contains contraband or other evidence of a crime." United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004) (citations omitted). Probable cause exists if the facts and circumstances are sufficient to lead a person of reasonable caution to believe evidence of a crime will be found in the place searched. Id. at 456-57 (internal citation omitted). "[C]ourts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not." Id. at 457 (citation omitted). Certainty is not required; the police only need a fair probability that contraband or evidence of a crime will be found. Id. (citing Gates, 462 U.S. at 238.

Under the circumstances here, Trooper Zink had probable cause to search Wint's car without his (or Chen's) consent. At the time of the search, the police had already found a significant amount of narcotics at Wint's apartment. Both Trooper Zink and Detective Daniell testified that Young told police she and Wint had actually driven by Trooper Godfrey's traffic stop of Ingraham and Poole -- which was the impetus for moving the car to the hospital parking lot with the intent of hiding it from the police. Trooper Zink also testified that Young told police the car had been used to transport narcotics between New York City and Bennington, Vermont. The Court credits this testimony. The totality of the circumstances established probable cause to believe additional evidence linked to Wint's involvement in narcotics distribution would likely be found in his car. See Gaskin, 364 F.3d at 457.

And even if the consent issue were not moot, the Court finds that Wint validly gave written consent to search his car and he was not represented by counsel at the time. "'[T]he fact that a defendant is in custody does not alone vitiate his consent to a search,'" but it "does 'require more

careful scrutiny.'" United States v. Acosta, 12-cr-224-pgg, 2013 WL 1890337, at *12 (S.D.N.Y. May 6, 2013) (quoting United States v. Puglisi, 790 F.2d 240, 243 (2d Cir. 1986)). Zink testified he made no threats to Wint or Chen before obtaining their written consent to search the car. He also explained to Wint the choice between giving consent and requiring Zink to get a warrant.[5] Zink testified it was Wint's idea to call Chen and ask for her consent as well.

According to Wint's state court docket sheet, Dft. Ex. B at 2, Wint's arraignment was originally scheduled for arraignment at 1 p.m. on May 23, 2012. Sometime on May 23, Wint appeared in court and invoked the "24-hour rule" -- which allows defendants additional time before arraignment -- and was formally arraigned on May 24. Id. The docket sheet also states that at some point on May 23, attorney Frederick Bragdon was assigned to represent him. Id. No document in evidence, however, reveals what time Wint was actually assigned a lawyer.

The result here again hinges on a credibility determination. See Fijal, 2013 WL 5522887, at *9. Trooper Zink credibly testified that "probably two minutes" before speaking with Wint on May 23, 2012, at 2:30 p.m. at the Bennington courthouse, a court clerk and Lieutenant Brookman of the Bennington Sheriff's Department -- the officer in charge -- each separately told Zink that Wint

---

[5] The Vermont State Police consent card itself, Gov't Ex. 2, explains it is to be used "[w]hen probable cause exists and [the police] intend to apply for a warrant." It states as follows:

> I, Trooper Zink, believe that I have probable cause to seize VT 55858, 2007 Dodge Nitro here under your control. I will be attempting to obtain a search warrant from a judge. You may choose to allow a search now or you may require that I attempt to obtain a search warrant from a judge. The choice is yours. I freely give permission to Trooper Zink to conduct a search of the items listed above and their contents. I understand I do not have to allow this. No threats or promises have forced this consent.

Zink credibly testified he filled in the consent card's underlined portions (with the exception of "[t]he choice is yours," which is emphasized in the card) and Wint signed it on May 23, 2012, at 2:30 p.m.

had not yet been assigned an attorney.  He testified that in his experience, arraignments in state court often do not occur at their scheduled time.

Wint, on the other hand, testified he "must have" appeared in court at 1 p.m. and insisted he had already been assigned a lawyer before he spoke with Zink.  He also testified Zink threatened to smash the car's windows if Wint did not give consent.  The Court does not credit Wint's testimony, which it finds patently self-serving and inconsistent.  On cross-examination, Wint conceded that his arraignment had only been scheduled for 1 p.m. and he did not know exactly what time he appeared in court.  Wint also could not explain why, if he had indeed just spoken with an attorney, he did not think to mention this to Zink.  The Court credits Zink's testimony and finds Wint had not yet been appointed counsel when he gave written consent to search the car.  Under the totality of the circumstances, the Court finds the government has also satisfied its burden of demonstrating voluntary consent to search the car.

IV. Conclusion

For the above reasons, Wint's motion to suppress evidence (Doc. 32) is DENIED.  This case will be placed on the June 17, 2014 jury draw calendar.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 14th day of April, 2014.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
United States District Judge